FLOYD *v.* DILLAHA.

4-9958                                        256 S. W. 2d 48

Opinion delivered March 23, 1953.

*Barber, Henry & Thurman,* for appellant.

*Frances D. Holtzendorff* and *Chas. B. Thweatt,* for appellee.

GRIFFIN SMITH, Chief Justice. Carrie Wilkins died in 1951. A little less than two months before this event she executed a will by which all of her property was to pass to a sister, Mrs. Inez Floyd. The will was probated without notice, the petition showing a "probable value" of $35,000.

In mid-July Mrs. Harriet Ella Dillaha and others petitioned the probate court to declare the will invalid, alleging mental incapacity of the testatrix and the undue influence and fraud of Inez Floyd in procurement of its execution. The court found against the first contention, but avoided the will upon the ground that Mrs. Floyd had unfairly dealt with her sister. Others who joined in the petition were Mrs. Ophelia Harrison, a sister, and four nieces and nephews.

Carrie Wilkins, who was 66 years of age when she died, was reared near Jacksonville, Ark., where she grew up with Inez and other members of the family. Prior to 1908 the two sisters came to Little Rock and obtained employment with the same establishment. After living with an aunt for a short period they procured rooming quarters on West Markham street, then moved to Tenth street near Battery, remaining together until Carrie married. Within two or three years she moved to St. Louis, then to Chicago where she resided for many years. Carrie became ill in 1945 and called Mrs. Floyd by telephone, asking her to come to Chicago. This she did, remaining for three months, or until Carrie seemingly regained her health. In the meantime Carrie had procured a divorce.

When Mrs. Floyd visited Carrie she ascertained that her sister was operating a business known as All-American Sales Company. After returning to Little Rock Mrs. Floyd claims to have kept in touch with her sister by telephone and correspondence. In May, 1950, Carrie informed Mrs. Floyd that she was ill and was compelled to sell her business. Later Carrie telephoned Mrs. Floyd that the sale had been consummated, but she asked Mrs. Floyd to come to Chicago to assist in packing

personal belongings. The two made the trip to Little Rock in Carrie's car.

Mrs. Floyd testified that shortly after coming to Little Rock Carrie told her she had some money in Chicago, and "she wanted me to have it transferred down here". Carrie had a pass book showing what the Chicago balance was. The sisters drove to the Worthen Bank where Carrie gave Mrs. Floyd the pass book, but remained in the car. Mrs. Floyd discussed the transaction with a bank official, who prepared a check for Carrie's signature. This was taken to the car, where Carrie signed it. Mrs. Floyd did not remember the amount deposited at Worthen's through this transfer, but thought it was a little more than thirty thousand dollars.[1] Carrie told her that the business had been sold for $10,000. The cash payment was $2,000 with the remainder payable $2,000 per year. In addition, Carrie owned "accounts receivable" representing sums owed by customers. Government bonds payable to "Inez Floyd or Carrie Wilkins", amounting to $15,000, were immediately purchased. Other business transactions followed.

Mrs. Floyd owned her home, debt free, at 1111 Louisiana street, and had been renting rooms for twenty-eight years. She bought "1107", but at the time did not want Carrie to "go into anything" until she had been in Little Rock long enough to make up her mind; so Mrs. Floyd borrowed $15,000 from Carrie in order that the two might have a comfortable home. This, she thought, was preferable to borrowing from a loan company. The debt-free property she lived in before Carrie left Chicago was worth $40,000—just a year before Mrs. Floyd had been offered that amount for the house and furnishings.

"I was going to pay Carrie interest [on the $15,000]", said Mrs. Floyd, "and she was very happy over [the arrangement?], but about the first of October, after we moved over to 1107 at her request, she said, 'O, Inez! Let's go 50-50!' And I said, 'Is that what you

[1] The bank statement, filed as an exhibit, shows $31,433.65 to have been deposited June 9, 1950, representing proceeds of check drawn on Lakeview Trust & Savings Bank, Chicago.

want to do?', and she said 'yes—we will just be 50-50 on everything',—meaning the ownership together".

Mrs. Floyd gave emphasis to the fact that she borrowed $7,000 at one time and $5,000 at another to improve the property at 1107. A mortgage was executed covering the rooming house at 1111 Louisiana street, the proceed of which was deposited in Worthen's Bank. Bonds aggregating $15,000 were cashed to pay these mortgages. When the bonds were sold the check was made payable to the sisters jointly. Mrs. Floyd took the check to Carrie, had her endorse it, paid the mortgages, and gave the difference of about $3,000 to Carrie.

While construction on the "1107" property was in progress Carrie insisted on sitting in the hall of the rooming house at 1111 so she could observe the work. According to Mrs. Floyd, Carrie contracted a cold as a result of this exposure and had to go to a hospital.

Mrs. Floyd said that "to begin with" she took Carrie to visit other relatives, "but they didn't seem to care too much about our visits". Some of these kin, however, would frequently visit Carrie.

This background history is shown in order to establish relationship of the sister-brother group and the nieces and nephews at the time Carrie became ill.

Mrs. Dillaha testified that Mrs. Floyd and Carrie did not get along together until the latter acquired money; that they quarreled frequently. These statements were supported by other witnesses. Some of the evidence was to the effect that Mrs. Floyd called Carrie by telephone and wrote frequently when it became known that she had money:—"She talked so nice and wrote such sweet letters that Carrie thought Inez had changed". There was abundant testimony that Carrie was fond of her other relatives, although that issue was disputed.

Mrs. Harrison's version of the personal relationship was that before Carrie went to the hospital she would not talk unreservedly if Mrs. Floyd were present; Carrie was not "free" to use the telephone or call relatives;

abusive language of an extremely harsh nature was used by Mrs. Floyd during discussions and arguments with Carrie, and threats were made by the dominant sister that she would have Carrie confined in State Hospital. Included in threats alleged to have been made by Mrs. Floyd (but based, seemingly, upon hearsay and not controlling) was that when the basement at 1107 was completed Carrie would be confined there "and no one would know what became of her".

A great deal of testimony went to Mrs. Floyd's refusal to coöperate in seeing that Carrie received appropriate medicines—drugs called for by prescriptions and thought to be essential to the patient's well-being or recovery. It is in evidence that she suffered from rheumatoid arthritis, rheumatic heart disease, with edema; was considerably overweight because of excessive fluid in the bodily tissues, experienced great difficulty in breathing while in a prone position, and her legs and hands were severely swollen. Dr. Blakely characterized Carrie's improvement while in the hospital as "miraculous" and attributed this temporary buildup to use of some of the new drugs. She recovered sufficiently to walk without crutches.

Appellant calls attention to the rule that, while statements and declarations of the testator, whether made before or after execution of the will, are competent for the purpose of testing mental capacity if in point of time they were made with reasonable proximity to such execution, yet they are not to be received as direct or substantive evidence of undue influence. When so offered they come within the hearsay rule. *Mason* v. *Bowen,* 122 Ark. 407, 183 S. W. 973; *Milton* v. *Jeffers,* 154 Ark. 516, 243 S. W. 60.

The undue influence that will avoid a will must be directly connected with its execution—the procuring cause. *Miller* v. *Carr,* 94 Ark. 176, 126 S. W. 1068. The principle goes back to *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590 and earlier. In the Campbell case it was said that undue influence sufficient to avoid a will is not the influence which springs from natural affection, or

is acquired by kind offices, but it is such as results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of property; and it must be directly connected with the execution of the will and specially directed toward the object of procuring a will in favor of particular parties.

In the Mason-Bowen case Judge Hart cited *Hobson v. Moorman*, 115 Tenn. 73. There Mr. Justice McALISTER of distinguished judicial fame reviewed holdings of the Tennessee courts prior to 1905. The opinion is cited in 3 LRA (NS) 749 under the single headnote: ''Ante-testamentary declarations of a testator are not admissible as substantive evidence of undue influence in the making of a will''. The editorial notes include many decisions where the line between substantive and hearsay testimony is finely drawn.

Judge McALISTER called attention to Wigmore's exhaustive treatise on the Law of Evidence, v. 3, § 1734, where the declarations of testators are divided into seven classifications. He then quotes from the fifth classification (§ 1738) to the effect that ''. . . The testator's assertion that a person, named or unnamed, has procured him, by fraud or by pressure, to execute a will or to insert a provision, is plainly obnoxious to the hearsay rule, if offered as evidence that the fact asserted did occur. . . . But these utterances may be, nevertheless, availed of as evidence of the testator's mental condition . . . if the latter fact is relevant. Though the issue is as to his mental condition, with regard to deception or duress at the time of execution, yet his mental state, both before and afterwards, is admissible as evidence of his state at . . . that . . . time. Thus the question is reduced to a simple one, namely, What particular mental conditions of the testator, thus evidenced, are material as being involved in the broader issue of deception or undue influence? There are here recognized by the courts two distinct sorts of mental condition. The existence of undue influence or deception involves incidentally a consideration of the testator's incapacity to resist pressure and his susceptibility to deceit, whether

in general or by a particular person. This requires a consideration of many circumstances, including his state of affections or dislikes for particular persons benefited or not benefited by the will, of his inclinations to obey or to resist these persons; and, in general, of his mental and emotional condition, with reference to its being affected by any of the persons concerned.

"All utterances and conduct, therefore, affording any indication of this sort of mental condition, are admissible, in order that from these the condition at various times (not too remote) may be used as the basis for inferring his condition at the time in issue. This use of such date is universally conceded to be proper . . . 'But for the purpose of proving matters not related to his existing mental state, the assertions of the testator are mere hearsay' ".

Elliott on Evidence, v. 1, § 5333, says that declarations of a testator may be received to corroborate direct testimony, ". . . . and in cases where fraud is the issue the statements of the testator are often admissible as declarations of a state of mind. So, also, in a case of undue influence".

In *Holloway* v. *Parker,* 197 Ark. 209, 122 S. W. 2d 563, 119 ALR 1359, a will alleged to have been forged was the subject of litigation. Declarations of the decedent were admitted partly upon the ground that the proponent had opened the door to such testimony through introduction of evidence as to the relations and state of feelings between the decedent and her relatives. The opinion, however, stated the court's preference not to rest the decision on that procdure alone. The rule was then announced that the declarations of a decedent on the issue of the genuineness of an instrument thereafter offered for probate as a will would be admissible when offered in addition to other evidence that the will is not genuine or that it is not properly executed.

Citation of the Holloway case must not be construed to mean that a will contested under an allegation of forgery and one questioned upon the issue of undue

influence are tested in all respects by the same rule; but here, as in the Holloway-Parker controversy, Mrs. Floyd introduced witnesses who told of conversations with the testator. Her exact language was quoted—statements relating to what it is claimed was the personal and business relationship between the two. This testimony was unquestionably competent in establishing Carrie's mental capacity; but it is so inextricably interlaced with the issue of undue influence that the Chancellor could not possibly consider it for one purpose without a reckoning of its value on the second count.

One witness, who spoke of discussions with Carrie, quoted her as saying, ''Well, I hope my relatives will be satisfied. They tried to make me make a will while I was in the hospital and I didn't see fit to, and now I have made it and I hope they will be happy''. There was further testimony to the effect that Carrie said she was tired of being annoyed by her relatives ''who had never seen fit to visit her before, and about all they are interested in was, 'What do you own, Carrie?' and, 'Have you made a will'?'' She was then quoted as having said: ''I didn't see fit to tell them because it wasn't any of their business. I thought I could make a will as I wanted to''.

We conclude that influence was an issue injected into the trial by Mrs. Floyd, and now she is not in a position to complain when the same type of testimony came from others. But while this is true it is appropriate to say that appellant's attorneys were not, in any respect, connected with the pressure program found by the Chancellor to have diverted Carrie's course from a normal and natural purpose not to prefer one class of kin to another. The attorneys who drew the will had nothing whatever to do with the disposition their client made of her property, and her competency to execute the document was sustained by the Chancellor insofar as mentality was concerned.

A great deal of testimony centers around Mrs. Floyd's persistent policy of personal direction respecting her sister's property and incidental conduct. This testi-

mony is of a pattern calculated to divert the testatrix from a rational course of conduct. It appears to have been the trial court's view that preponderating evidence showed that Carrie, while sick, virtually helpless, and despondent, reacted to plans prepared by Mrs. Floyd. substantially in advance of her sister's last illness. A review by detail would serve no useful purpose.

The judgment avoiding the will is affirmed, but the cause is remanded to the Probate Court for such procedure as may be necessary in view of the resulting status of intestacy.